Perez v. State 



IN THE COURT OF APPEALS, THIRD DISTRICT OF TEXAS,



AT AUSTIN




 





NO. 3-92-126-CR





ERNEST PEREZ,



 APPELLANT


vs.





THE STATE OF TEXAS,



 APPELLEE


 



FROM THE DISTRICT COURT OF TRAVIS COUNTY, 299TH JUDICIAL DISTRICT



NO. 0920062, HONORABLE JON N. WISSER, JUDGE PRESIDING


 




 Appellant was convicted of the murder and aggravated robbery of Travis County
Corrections Officer William Roderick Redman. Tex. Penal Code Ann. § 19.01 (West 1989); §
29.03 (West Supp. 1994). Punishment was assessed at ninety and sixty years confinement,
respectively, in the Institutional Division of the Texas Department of Criminal Justice, with the
sentences running concurrently. After appellant's conviction, the prosecutor notified appellant
and the trial court that the police had taken a written statement from a trial witness that had not
been disclosed to defense counsel prior to trial. Appellant filed a motion for new trial, contending
that the statement constituted exculpatory evidence. After a three-day hearing, the trial court
denied appellant's motion. We will affirm the convictions.



THE CONTROVERSY



 The following is derived from testimony presented at trial and during the hearing
on appellant's motion for new trial.

 At approximately 11:30 p.m. on February 20, 1991, Travis County Corrections
Officer William Roderick Redman was beaten to death. The victim's body was found by Austin
Police Officer Leon Williams in the parking lot of John Salazar's apartment. Officer Williams
found the victim upon arriving at Salazar's apartment, with Salazar in his custody. Officer
Williams had taken Salazar into his custody nearby for an unrelated incident half an hour earlier.

 After the victim's body was discovered, John Salazar was the prime suspect for the
murder of Officer Redman. Indeed, Salazar was the only suspect. Salazar was questioned at the
scene by Officer Williams, Sergeant Bruce Boardman, and Sergeant Brent McDonald, and told
the officers the names of several men and women who had been at his apartment earlier that
evening. Salazar, however, claimed to have no knowledge of Redman's murder.

 Salazar was taken to the police station, and at approximately 3:30 a.m., Sergeant
McDonald and Gary Cutler, a Travis County deputy sheriff, began questioning him. Salazar
repeatedly told the officers that he knew nothing about the murder. The officers were reluctant
to believe Salazar, however, since he had been the only person found in the vicinity of the murder
just after it had occurred.

 At approximately 10:00 a.m., McDonald began taking a written statement from
Salazar. Around 11:20 a.m., after typing about one and one-half pages, McDonald quit taking
Salazar's statement because he did not believe that Salazar was telling the truth. Sometime later,
Sergeant Hector Polanco began questioning Salazar. Other officers testified that Polanco was
alone with Salazar while questioning him. (1) Salazar testified that Polanco entered the room,
introduced himself, and said that his nickname was "El Diablo," and was used in special cases like
this one. Although, according to Salazar, Polanco did not "verbally abuse" him, Polanco
"intimidated" him.

 At some point during the interview, Polanco began taking down a written statement
from Salazar. Polanco typed the statement on the same sheet that McDonald had begun, picking
up where McDonald had left off. According to the portion of the statement taken by Polanco,
Salazar had witnessed the entire assault. Salazar later testified that this portion of the statement
was "invented" and was pure "fiction." Among its various inaccuracies, the account wrongly
casts Jose Flores, who was tried in a separate proceeding for the murder of Redman, (2) as a peace
maker who attempted to prevent Hernandez, Ybarra, and appellant from attacking the victim. (3) 
Salazar testified that he invented some portions of the statement himself, while other parts were
generated by suggestive questions from Sergeant Polanco. When asked why he had given a false
statement with such detail regarding things of which he had no knowledge, Salazar explained that
he hoped the police would check them out and find them to be false. Salazar hoped that then the
police would finally believe that he indeed knew nothing about the murder. The face of the
statement indicates that Salazar signed it at 2:17 p.m., before two witnesses.

 While Salazar was being questioned, Sergeant Boardman and Deputy Cutler were
questioning appellant and Flores in New Braunfels. Sergeant Boardman and Deputy Cutler had
left for New Braunfels at about 6:30 a.m., after receiving word that several of the persons named
by Salazar as having been at his apartment were in custody. Boardman and Cutler obtained
confessions from both appellant and Flores.

 At some point during the afternoon after the confessions were obtained, Boardman
telephoned the Austin Police Department to tell the other homicide officers that he and Cutler had
solved the case. Boardman did not remember who he talked to on the phone. After describing
the confessions, the person on the other end of the line told Boardman that a statement had been
taken from John Salazar that described a different chain of events. Boardman responded that the
statement could not be correct; appellant and Flores both indicated that Salazar could not have
witnessed the murder because he was being questioned by Officer Williams when the murder
occurred. Boardman testified that he said something to effect of, "You better take that one back." 
However, Boardman testified that he did not intend his statement to be understood as an
instruction to hide the Salazar statement.

 Appellant was tried for the aggravated robbery and murder of Redman. Sergeant
McDonald testified during appellant's trial, and when asked whether he had ever taken a written
statement from Salazar, left the impression that he had never done so. Appellant was convicted
of aggravated robbery and murder on January 31, 1992.

 On April 15, 1992, Sergeant McDonald found the Salazar statement while cleaning
out a file cabinet in the police station. Believing that the statement was evidence favorable to
appellant, McDonald immediately turned it over to the prosecutor, who in turn informed the trial
court and defense counsel. The written statement was stapled together with other material. At
the top of one of the pages was the handwritten notation, "Not needed, homicide, TCSO." 
McDonald stated that this was his handwriting, but he did not recall writing it. Furthermore,
McDonald stated that he had no memory of having made a conscious decision to "hide" or "get
rid of" the statement.

 Both appellant and Flores filed motions for new trial, contending the Austin Police
Department had suppressed exculpatory evidence. After conducting a joint three-day hearing for
both appellant and Flores, the trial court overruled both motions for new trial. The trial court
made the following conclusions of law:



1. In the trials of defendants Jose Flores and Ernest Perez the State failed to
furnish the defense counsel with John Salazar's written statement. This failure
was not the result of prosecutorial misconduct but of the failure of the officers
who obtained Salazar's statement to reveal its existence.


2. The written statement of John Salazar differed from the testimony that he gave
at the defendant's trials and thus should be categorized as impeachment
evidence, and as such, should be considered favorable to the accused.


3. The convictions of the two defendants was (sic) based on their confessions, the
testimony of a number of eye-witnesses, expert witness testimony, and a very
graphic array of real and photographic evidence. John Salazar's testimony
was not essential to the State's case, and even if he had been impeached by his
prior inconsistent statement, this would of (sic) been of little significance. 
Having presided over both these trials, I find that the undisclosed statement of
John Salazar was not material. Even if the statement had been given to the
defense counsel there is no reasonable probability that the result would have
been different. I conclude that the evidence not revealed by the State in these
cases does not undermine my confidence in the verdicts returned in each case.



Appellant appeals his conviction and the trial court's denial of his motion for new trial, raising
two points of error.



DISCUSSION


 In his first point of error, appellant contends that the trial court erred by not
granting a new trial because the written statement taken by the Austin Police Department from
Salazar constituted exculpatory evidence that was withheld from appellant by the prosecution. 
Prior to trial, appellant had filed motions, which were granted by the trial court, directing the
State to reveal all mitigating and exculpatory evidence to appellant. Appellant contends that the
State's failure to provide him with the statement deprived him of a fair trial under the rule first
announced in Brady v. Maryland, 373 U.S. 83 (1963). Under the rule of Brady, a prosecutor has
a constitutional duty to volunteer exculpatory matter to the defense, in order to protect the
defendant's right to a fair trial, pursuant to the due process clause of the Fourteenth Amendment. 
The defendant's constitutional rights are violated if the evidence omitted by the prosecutor creates
a reasonable doubt about guilt.

 Texas utilizes a three-part test to determine whether a defendant has been deprived
of a fair trial by the nondisclosure of evidence:



(1) Has there been a failure to disclose evidence?;


(2) Is that evidence favorable to the accused?; and


(3) Does that evidence create a probability sufficient to undermine the
confidence in the outcome of the proceeding?



Ex parte Mitchell, 853 S.W.2d 1, 4 (Tex. Crim. App.), cert. denied, 114 S. Ct. 183 (1993);
Thomas v. State, 841 S.W.2d 399, 404 (Tex. Crim. App. 1992).

 In its conclusions of law, the trial court ruled that Salazar's written statement was
properly categorized "as impeachment evidence, and as such, should be considered favorable to
the accused." However, the trial court concluded that even if the statement had been given to
defense counsel, there was not a reasonable probability that the result of appellant's trial would
have been different. The trial court reasoned that even though the statement was inconsistent with
Salazar's testimony at trial, it was undisputed that Salazar was not present when the murder
occurred. Indeed, appellant conceded at oral argument that the statement had no value as a tool
to impeach Salazar's testimony.

 Appellant, however, maintains that he could have used the statement to impeach
Sergeant Boardman. Appellant regards Boardman as a crucial witness for the State because he
was the officer who took appellant's confession. At trial, appellant testified that the victim had
made racial slurs. Appellant's confession was silent on this point. The State called Boardman
to the stand to testify that appellant did not mention racial slurs when he confessed. Appellant
contends that he could have used the evidence of police misconduct to impeach Boardman's
testimony.

 Having reviewed the record, including both the trial court proceedings and the
hearing on appellant's motion for new trial, we cannot say that the trial court erred by denying
appellant's motion for new trial. As the trial court pointed out, the convictions of appellant and
Flores were based on extensive evidence: "their confessions, the testimony of a number of
eye-witnesses, expert witness testimony, and a very graphic array of real and photographic
evidence." Appellant signed a written confession stating that he went outside Salazar's apartment
when Hernandez told him that Flores and the victim were arguing. Once outside, appellant stated
that Flores hit the victim first, then, "I hit the guy one time in the face. He tried to run and I
grabbed him and Jose [Flores] hit him some more." Appellant then stated that he stabbed the
victim in the back when the victim "jumped up." After the victim "went down," appellant took
his wallet and returned with it to the apartment. Appellant does not contend that any of this did
not occur. Likewise, he does not challenge the confession as having been coerced or involuntary.

 Eyewitness testimony at trial expands upon the events related in appellant's
confession. Anthony Ybarra testified that Flores approached the victim to ask him whether the
police had arrested Salazar. Ybarra testified that when the victim tried to walk away, appellant
hit him in the face. Appellant then grabbed the victim by the collar, and both appellant and Flores
began hitting the victim. Ybarra stated that appellant told him to go inside the apartment, which
he did. From the apartment, Ybarra could still see appellant and Flores hitting the victim. Ybarra
testified that appellant later entered the apartment and gave him a knife, stating, "I stabbed him." 
The knife, which was admitted into evidence at trial, bore traces of blood that matched the
victim's blood type.

 Monica Lopez, another witness, testified that the assault began when appellant hit
the victim in the face with his fist. Appellant was then joined by Flores. Lopez testified that
appellant and Flores repeatedly hit and kicked the victim, despite the victim's attempts to flee. 
Eventually, appellant and Flores dragged the victim behind a car and out of her view, but she
could still see appellant and Flores moving. Lopez testified that shortly thereafter, appellant
entered the apartment and told everyone to leave, stating they had "just killed a cop." Lopez also
stated appellant had entered the apartment carrying a wallet and knife.

 Christie Wilbur did not witness the entire assault, but testified that she saw both
appellant and Flores hit the victim. Linda Overway did not witness the assault, but testified that
appellant entered the apartment with a knife and announced that he had stabbed the victim and
taken his wallet. Overway also testified that she heard appellant state, "We're gonna get the death
penalty." Based upon this abundant evidence, we agree with the trial court that the statement's
impeachment value does not create a probability sufficient to undermine confidence in appellant's
conviction. (4)

 Finally, we reject appellant's implicit contention that he should have been able to
use the statement to impeach the Austin Police Department's entire investigation of the murder
of Officer Redman. To contend that what might have been misconduct on the part of two police
officers somehow erodes the probative force of eyewitness trial testimony, a confession from the
accused, and physical evidence strains the bounds of reason. Appellant's first point of error is
overruled.

 In his second point of error, appellant contends that he is entitled to a new trial
because the prosecutor's final closing argument was improper in that it implied that defense
counsel suborned perjury from Paul Hernandez. Appellant lodged no objection to the prosecutor's
argument at trial. Generally, a defendant must timely object to improper jury argument to
preserve error for appeal. An objection is not necessary to preserve error only when the improper
statement is so prejudicial that an instruction to disregard would not cure the harmful effect. 
Borgen v. State, 682 S.W.2d 620, 623 (Tex. Crim. App. 1984) (citing Romo v. State, 631 S.W.2d
504, 505 (Tex. Crim. App. 1982)).

 We have reviewed the arguments of the prosecutor, and we do not find them to be
so highly prejudicial that they could not have been cured by an instruction from the trial court. 
Accordingly, appellant waived any error by not objecting to the argument. Appellant's second
point of error is overruled.



CONCLUSION


 Finding no error, we affirm the convictions.



 Mack Kidd, Justice

Before Chief Justice Carroll, Justices Kidd and B. A. Smith

Affirmed

Filed: August 17, 1994

Do Not Publish

1.   Sergeant Hector Polanco was not called as a witness at the hearing on appellant's
motion for new trial, nor was he called as a witness at appellant's trial. The trial court
made a finding that had Polanco been called as a witness, he would have invoked his right
against self-incrimination and would have refused to answer questions from either the
State or the defense.
2.   Jose Flores had been tried and convicted for the murder of Officer Redman before
appellant's trial. Jose Flores also filed a motion for new trial, contending that the
withheld statement constituted exculpatory evidence. Flores' appeal from his conviction
is also before this Court. See Flores v. State, No. 3-92-155-CR.
3.   The statement also says that Paul Hernandez stabbed the victim; this contradicts
the testimony of all who witnessed the assault, including the confessions of appellant and
Flores. The statement says that Anthony Ybarra hit the victim in the head with an
Easton brand aluminum bat and that appellant hit the victim with a rail taken from the
walkway of the apartment. No bat was found at the scene, and there was no evidence
indicating that a rail had been used to strike the victim.
4.   Appellant also contends that had defense counsel possessed the statement, the jury
might have only convicted him of voluntary manslaughter, after he impeached Sergeant
Boardman's testimony that appellant did not mention any racial slurs during his
confession. The jury heard testimony from appellant and Hernandez that the victim made
racial slurs. However, racial slurs alone cannot constitute adequate provocation, without
testimony that they "would commonly produce a degree of anger, rage, resentment or terror in
a person of ordinary temper, sufficient to render the mind incapable of cool reflection." Tex.
Penal Code Ann. § 19.04(c) (West 1989). There is no such testimony in the record.